No. 23-5409

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA,
BUSINESS ROUNDTABLE, and TENNESSEE CHAMBER
OF COMMERCE & INDUSTRY,
*Plaintiffs-Appellants*,

v.

SECURITIES AND EXCHANGE COMMISSION, and
GARY GENSLER in his official capacity as Chair
of the Securities and Exchange Commission
*Defendants-Appellees.*

Appeal from the United States District Court
for the Middle District of Tennessee

## BRIEF FOR DEFENDANTS-APPELLEES

MEGAN BARBERO
General Counsel

MICHAEL A. CONLEY
Solicitor

TRACEY A. HARDIN
Assistant General Counsel

DANIEL E. MATRO
Senior Appellate Counsel

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-8248 (Matro)

## STATEMENT REGARDING ORAL ARGUMENT

The Commission does not believe that oral argument is necessary to assist the Court in its consideration of the issues, which are controlled by settled law and adequately presented in the briefs and record.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ..................................................... i

TABLE OF AUTHORITIES ................................................................................. iv

INTRODUCTION ............................................................................................... 1

COUNTERSTATEMENT OF THE ISSUES .................................................... 7

COUNTERSTATEMENT OF THE CASE ......................................................... 8

A.    Market Overview ................................................................................. 8

B.    Statutory and Regulatory Background ............................................ 10

C.    Proceedings Before the Commission ............................................... 11

    1.    The Commission adopted the 2020 Rules by a divided vote ................... 11

    2.    The Commission reconsidered its policy judgment and, after notice and comment, rescinded parts of the 2020 Rules ...................................... 14

D.    Proceedings Before the District Court .............................................. 16

SUMMARY OF ARGUMENT ............................................................................ 18

ARGUMENT ........................................................................................................ 21

I.    The 2022 Amendments were reasonable and reasonably explained .................. 21

    A.    The Commission provided a reasoned explanation for weighing the competing policy concerns differently than it did in 2020 ........................ 23

    B.    The Commission reasonably concluded that the conditions pose risks to the cost, timeliness, and independence of proxy voting advice ........... 28

        1.    The Commission reasonably identified the risk of higher costs for proxy voting advice ..................................................... 29

        2.    The Commission reasonably identified the risk to the timeliness of proxy voting advice ....................................................... 30

        3.    The Commission reasonably identified the risk to PVAB independence ................................................................................. 31

C.     The Commission did not contradict any prior factual findings and thus no "more detailed justification" was required ....................................33

       1.    The Commission did not reject any prior factual findings regarding the risks to timeliness and independence........................34

       2.    The Commission did not reject any prior factual findings regarding PVABs' voluntary practices ................................36

D.     Plaintiffs' objections to the Commission's economic analysis are meritless ...........................................................................................38

       1.    There is no inconsistency in the Commission's analysis of the benefits of rescinding the conditions ................................38

       2.    The Commission's qualitative analysis of the costs of rescission was reasonable ....................................................39

II.    The 2022 Amendments were procedurally valid ....................................42

A.     The Commission provided a sufficient opportunity for public participation ..................................................................................42

B.     Any deficiency in the comment period was plainly harmless ..................50

III.   Plaintiffs err in contending that vacatur is warranted if the Court finds an APA violation............................................................................................51

CONCLUSION ....................................................................................................55

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*Air Alliance Houston v. EPA*, 906 F.3d 1049 (D.C. Cir. 2018) .......................................... 35

*Allina Health Servs. v. Sebelius*, 746 F.3d 1102 (D.C. Cir. 2014) ................................ 52, 53

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649 (D.C. Cir. 2019) .... 51, 52

*Am. Hosp. Ass'n v. Azar*, 983 F.3d 528 (D.C. Cir. 2020) ................................................. 40

*Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427 (D.C. Cir. 2012) ........... 41

*Becerra v. Dep't of the Interior*,
  381 F. Supp. 3d 1153 (N.D. Cal. 2019) ........................................................... 43, 45, 48

*Bus. Roundtable v. SEC*, 647 F.3d 1144 (D.C. Cir. 2011) ................................................. 41

*Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337 (D.C. Cir. 2019) ........................ 53, 54

*Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*,
  2021 WL 3609986 (D.D.C. Apr. 4, 2021) ................................................................ 44

*Cent. & S.W. Servs., Inc. v. EPA*, 220 F.3d 683 (5th Cir. 2002) ...................................... 53

*Centro Legal de la Raza v. Exec. Off. for Immigr. Rev.*,
  524 F. Supp. 3d 919 (N.D. Cal. 2021) ................................................................ 44, 45, 51

*Chamber of Commerce v. SEC*, 412 F.3d 133 (D.C. Cir. 2005) ............................... 39-40, 41

*Chem. Mfrs. Ass'n v. EPA*, 899 F.2d 344 (5th Cir. 1990) ................................................. 43

*City of Arlington v. FCC*, 668 F.3d 229 (5th Cir. 2012) ................................................... 50

*City of Cleveland v. Ohio*, 508 F.3d 827 (6th Cir. 2007) ................................................. 21

*Clean Water Action v. EPA*, 936 F.3d 308 (5th Cir. 2019) ................................... 22, 33, 35

*Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387 (D.C. Cir. 1990) .................... 54

*Coal. for Workforce Innovation v. Walsh*,
  2022 WL 1073346 (E.D. Tex. Mar. 14, 2022)..............................................................43

*Conn. Light & Power Co. v. NRC*, 673 F.2d 525 (D.C. Cir. 1982) ............................. 43, 47

*Ctr. for Food Safety v. Regan*, 56 F.4th 648 (9th Cir. 2022) ............................................. 53

*Daimler Trucks N. Am. LLC v. EPA*, 737 F.3d 95 (D.C. Cir. 2013) ........................ 52-53

*Estate of Smith v. Bowen*, 656 F. Supp. 1093 (D. Colo. 1987) ..................................... 43-44

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ............................... 22, 23, 27, 33

*FCC v. Prometheus Radio Project*, 141 S. Ct. 1150 (2021) ............................... 21, 40

*Fleming Cos. v. USDA*, 322 F. Supp. 2d 744 (E.D. Tex. 2004) ....................................... 43

*Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027 (D.C. Cir. 2002) ............................... 52

*Handley v. Chapman*, 587 F.3d 273 (5th Cir. 2009) ............................................... 22

*Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193 (D.C. Cir. 2009) ................................. 53

*Home Box Off., Inc. v. FCC*, 567 F.2d 9 (D.C. Cir. 1977) .................................... 49

*Inv. Co. Inst. v. CFTC*, 720 F.3d 370 (D.C. Cir. 2013) ....................................... 22

*Lindeen v. SEC*, 825 F.3d 646 (D.C. Cir. 2016) ......................................... 38, 39, 40

*Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126 (D.C. Cir. 2022) ............................ 29, 53

*Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032 (D.C. Cir. 2012) .............. 22, 33, 35

*Nat'l Ass'n of Mfrs. v. SEC*, 631 F. Supp. 3d 423 (W.D. Tex. 2022) .............................. 15

*Nat'l Ass'n of Mfrs. v. SEC*, 2022 WL 17420760 (W.D. Tex. Dec. 4, 2022) .................. 15

*Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102 (D.C. Cir. 2019) ............................................ 43

*Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243 (D.C. Cir. 2014) ....................................... 55

*N.C. Growers' Ass'n v. United Farm Workers*, 702 F.3d 755 (4th Cir. 2012) ............. 43, 48

*Oakbrook Land Holdings, LLC v. Comm'r*, 28 F.4th 700 (6th Cir. 2022) ....... 21-22, 28-29

*Omnipoint Corp. v. FCC*, 78 F.3d 620 (D.C. Cir. 1996) ............................................. 46, 50

*Organized Vill. of Kake v. USDA*, 795 F.3d 956 (9th Cir. 2015) ....................................... 35

*Pangea Legal Servs. v. DHS*, 501 F. Supp. 3d 792 (N.D. Cal. 2020) ................... 44, 45, 46

*Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015) ............................................... 55

*Prometheus Radio Project v. FCC*, 652 F.3d 431 (3d Cir. 2011) ........................................... 44

*Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240 (D.D.C. 2015) ..... 51-52, 53

*Shinseki v. Sanders*, 556 U.S. 396 (2009) ................................................................. 51

*Sierra Club v. Costle*, 657 F.2d 298 (D.C. Cir. 1981) ........................................... 49

*Stilwell v. Off. of Thrift Supervision*, 569 F.3d 514 (D.C. Cir. 2009) ................... 29

*Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*,
    989 F.3d 368 (5th Cir. 2021) ......................................................................... 52

*Tex. Off. of Pub. Util. Counsel v. FCC*, 265 F.3d 313 (5th Cir. 2001) ................. 49

*Texas v. Lyng*, 868 F.2d 795 (5th Cir. 1989) ........................................................ 51

*United States v. Stevenson*, 676 F.3d 557 (6th Cir. 2012) ..................................... 50

*United States v. Utesch*, 596 F.3d 302 (6th Cir. 2010) .......................................... 50

*U.S. Telecom Ass'n v. FCC*, 400 F.3d 29 (D.C. Cir. 2005) ............................... 50-51

*Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130 (5th Cir. 2021) ........... 35

**Statutes**

5 U.S.C. 553(c) ..................................................................................................... 42

5 U.S.C. 706 .......................................................................................................... 50

Securities Exchange Act of 1934, 15 U.S.C. 78a, *et seq.*

    Section 14(a)(1), 15 U.S.C. 78n(a)(1) ...................................................... 10, 22

    15 U.S.C. 78pp ................................................................................................ 12

**Rules and Regulations**

17 C.F.R. 202.6(b) ................................................................................................ 47

Rules Under the Securities Exchange Act of 1934, 17 C.F.R. 240.01, *et seq.*

    Rule 14a-1, 17 C.F.R. 240.14a-1 ................................................................... 10

    Rule 14a-2, 17 C.F.R. 240.14a-2 ................................................................... 10

    Rule 14a-3, 17 C.F.R. 240.14a-3 ................................................................... 10

    Rule 14a-9, 17 C.F.R. 240.14a-9 ........................................................... *passim*

    Rule 14a-15, 17 C.F.R. 240.14a-15 ............................................................... 10

    Rule 14a-19, 17 C.F.R. 240.14a-19 ............................................................... 10

Rules Under the Investment Advisers Act of 1940, 17 C.F.R. 275.0-2, *et seq.*

    Rule 206(4)-6, 17 C.F.R. 275.206(4)-6...............................................................9

Fed. R. Civ. P. 6(a)(1)(B) ................................................................................ 46

## Commission Releases

*Amendments to Exemptions From the Proxy Rules for Proxy Voting Advice,*
    84 Fed. Reg. 66,518 (Dec. 4, 2019)............................................................ 30

*Commission Guidance Regarding Proxy Voting Responsibilities of Investment Advisers,*
    84 Fed. Reg. 47,420 (Sept. 10, 2019) ..........................................................14

*Concept Release on the U.S. Proxy System,*
    75 Fed. Reg. 42,982 (July 22, 2010) .................................................... 9, 10

*Exemptions from the Proxy Rules for Proxy Voting Advice,*
    85 Fed. Reg. 55,082 (Sept. 3, 2020) ...................................................... *passim*

*Procedural Requirements and Resubmission Thresholds Under Exchange Act Rule 14a-8,*
    85 Fed. Reg. 70,240 (Nov. 4, 2020) ...........................................................47

*Proxy Voting Advice,*
    87 Fed. Reg. 43,168 (July 19, 2022) ...................................................... *passim*

*Proxy Voting Advice,*
    86 Fed. Reg. 67,383 (Nov. 26, 2021) .................................................. 15, 49

*Regulation of Communications Among Shareholders,*
    57 Fed. Reg. 48,276 (Oct. 22, 1992) ............................................................8

*Supplement to Commission Guidance Regarding Proxy Voting Responsibilities of Investment Advisers,* 85 Fed. Reg. 55,155 (Sept. 3, 2020) ............... 14, 16, 21, 53, 54

No. 23-5409

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA,
BUSINESS ROUNDTABLE, and TENNESSEE CHAMBER
OF COMMERCE & INDUSTRY,
*Plaintiffs-Appellants*,

v.

SECURITIES AND EXCHANGE COMMISSION, and
GARY GENSLER in his official capacity as Chair
of the Securities and Exchange Commission
*Defendants-Appellees.*

Appeal from the United States District Court
for the Middle District of Tennessee

**BRIEF FOR DEFENDANTS-APPELLEES**

**INTRODUCTION**

Proxy voting advice businesses ("PVABs") provide advice to investors in exercising their right as shareholders to vote on a wide variety of corporate matters. In recent years, PVABs have come to play an increasingly important role in the proxy voting process. That process is regulated by the Securities and Exchange Commission, and the rulemaking at issue here is the latest step in the Commission's efforts to strike an appropriate balance in regulating PVABs, which have historically operated pursuant to exemptions from some of the Commission's proxy rules.

1

Proponents of additional PVAB regulation have argued that measures are needed to facilitate companies' ability to respond to factual and analytical errors in proxy voting advice before votes are held. But PVABs and many of the investors and investment advisers that depend on their advice respond that there is no compelling evidence of material deficiencies in proxy advice, that registrants have ample means to convey their views to shareholders, and that new regulatory burdens could adversely affect the cost, timeliness, and independence of proxy advice.

In 2020, the Commission adopted a package of proxy rule amendments representing one view of how to strike the appropriate regulatory balance. The 2020 rules codified the Commission's statutory interpretation that proxy voting advice is a form of solicitation subject to the proxy rules (including potential liability for misstatements or omissions of material fact) and placed three new conditions on the exemptions historically relied on by PVABs. But many of the investors whom the rules were intended to benefit disagreed with the Commission's policy judgment. In 2022, the Commission rescinded two of the exemption conditions but left in place the statutory codification and the condition requiring conflicts-of-interest disclosure, finding that doing so more appropriately balanced the competing concerns.

The rescinded conditions required (1) that PVABs provide their advice to companies at the same time they deliver it to clients and (2) that they notify clients of any response filed by the company (the "notice-and-awareness conditions"). Plaintiffs

and their *amici* inaccurately portray these conditions as the product of a bipartisan consensus. In reality, the conditions were controversial and contested from the start: every Commission vote on the proposed and adopted 2020 rules and 2022 amendments was sharply divided. As the district court recognized, that division is attributable to different reasonable judgments about how to weigh the conditions' uncertain and unquantifiable benefits and risks.

In adopting the conditions in 2020, the Commission did not find that the conditions were needed to address any proven deficiencies in proxy advice. Indeed, it acknowledged that the evidence of alleged deficiencies was mixed and heavily contested. Nor did the Commission dispute that the conditions—which require PVABs to monitor and potentially send clients multiple notices when any of the thousands of recommendations they make within the span of a few months each year prompts a company response—posed some risk to the cost, timeliness, and independence of proxy voting advice. On the contrary, the Commission acknowledged that imposing new burdens on PVABs could potentially disrupt the delivery of their advice. And it recognized that increasing the cost of advice that disagrees with company management could impair PVABs' independence.

But the Commission concluded that the conditions would facilitate investor access to additional discussion that could inform their voting decisions. And it concluded that it had mitigated the overall risks to the cost, timeliness, and

3

independence of proxy voting advice by eliminating an advance review process it had proposed in 2019 and instead requiring that advice be shared with companies only after it had been finalized.  The Commission was unable to quantify (and thus directly compare) the potential informational benefits and risks of this approach.  Rather, acknowledging that reasonable minds could disagree, it made a policy judgment that the benefits sufficiently justified the remaining risks.

As the district court correctly held, the Commission provided a reasoned explanation for weighing the competing interests differently in 2022.  The Commission acknowledged that it was reconsidering the balance struck in 2020 and concluded that the general information benefits it had previously relied on did not justify the conditions' potential adverse effects.  In doing so, it thoroughly discussed commenters' arguments with respect to those benefits and risks.  And it identified the considerations it found persuasive, including:  strong opposition to the conditions from the investors and PVAB clients they were intended to benefit; the absence of persuasive evidence of systemic deficiencies in proxy advice that would necessitate retaining the conditions; the significance of the consequences to the proxy voting process if the timeliness or independence of proxy advice were impaired; the fact that companies would still have access to pre-existing mechanisms and voluntary practices in responding to proxy advice; and the lack of any significant reliance interests.

Plaintiffs identify no valid basis for this Court to second-guess the Commission's judgment. They argue that the Commission failed to explain how the conditions could affect the cost, timeliness, and independence of proxy advice. But the Commission specifically highlighted concerns about adding to the timing and logistical challenges PVABs face and incentivizing PVABs to tailor their advice to avoid burdens triggered by a company's response—the same concerns it acknowledged and weighed when adopting the conditions in 2020. Plaintiffs' assertion that the Commission had to quantify benefits and risks is equally meritless. In both rulemakings, the Commission explained that it lacked the data to do so, and plaintiffs fail to identify any data that would have permitted meaningful estimates.

Plaintiffs also incorrectly assert that a more detailed explanation was needed, arguing that the Commission rejected prior factual findings. They misinterpret a Commission statement in the 2020 release explaining that the notice condition addressed the unique timeliness and independence risks posed by the proposed advance review process as a finding that the final conditions posed no such risks at all. But the Commission's policy choice to adopt the conditions, like its decision to rescind them, rested on a weighing of relative benefits and risks, not an illogical and unnecessary finding that it had discovered a regulation with only benefits and no risks.

Nor was there any *factual* inconsistency in the Commission's discussion of PVABs' voluntary practices. In both rulemakings, the Commission recognized that

5

the conditions would more effectively facilitate company responses to proxy advice than those practices.  It differed on the *policy* question whether that additional informational benefit justified the conditions.  And in rescinding the conditions, the Commission reasonably considered it relevant that companies would not be left without any ability to respond to proxy advice.

The district court also correctly rejected plaintiffs' procedural challenge.  The 31-day comment period exceeded the length courts have held is generally sufficient to elicit meaningful comment even for significant rule changes.  And it did elicit meaningful comment.  The Commission received dozens of comments supporting and opposing the conditions.  Plaintiffs have not identified a single interested party that was unable to comment or any arguments or specific evidence that were not presented.  Instead, they resort to a simplistic numeric comparison of the comments received in 2020 and 2022 that, as the district court recognized, fails to account for the more targeted nature of this rulemaking and the fact that the relevant record was already well developed.  And in any event, plaintiffs do not come close to showing that they were prejudiced by any procedural deficiency.

Shifting from one reasonable policy approach to another after a change in the composition of the Commission and additional notice-and-comment rulemaking is neither nefarious nor surprising.  It is a permissible recalibration by a multimember

agency confronting a challenging issue for which there is no compelled solution.  The district court's judgment should be affirmed.

## COUNTERSTATEMENT OF THE ISSUES

1. Whether the Commission provided a reasoned explanation for weighing the notice-and-awareness conditions' uncertain benefits and risks differently than in 2020 in light of strong investor opposition to the conditions, the lack of evidence of systemic inaccuracies, existence of other mechanisms for registrants to communicate their views, and the fact that PVABs will remain subject to Rule 14a-9 liability and conflicts-disclosure requirements.

2. Whether, in striking a different balance between the previously acknowledged risks and benefits of the 2020 Rules, the Commission met its legal obligations by providing the level of justification ordinarily required under the Administrative Procedure Act ("APA").

3. Whether the comment period, which exceeded the amount of time courts have indicated is generally sufficient to elicit meaningful comment, complied with the APA, and in any event, was harmless to plaintiffs.

4. Whether the appropriate remedy for any of plaintiffs' claims would be to remand for the Commission to remedy the deficiency without vacating any of the 2022 Amendments.

## COUNTERSTATEMENT OF THE CASE

### A.    Market Overview

Shareholders of public companies generally have a right under state law to vote on corporate governance matters at shareholder meetings.  At these meetings, public companies elect directors, approve executive compensation, and consider other management and shareholder proposals.  They may also consider mergers and acquisitions or other major transactions.

The vast majority of shareholders do not attend shareholder meetings in person; they vote through the use of proxies.  R. 35-2 (*Exemptions from the Proxy Rules for Proxy Voting Advice*, 85 Fed. Reg. 55,082 (Sept. 3, 2020)) (2020 Rules) at 291.[1] Typically, management (or another soliciting party) will distribute to shareholders written materials, also filed publicly with the Commission, that describe the issues to be considered and seek authorization to vote on their behalf.  *See Regulation of Communications Among Shareholders*, 57 Fed. Reg. 48,276, 48,277 (Oct. 22, 1992).

Today, a substantial majority of the shares issued by U.S. public companies are owned by intermediaries such as broker-dealers, mutual funds, and pension plans. R. 35-2 (2020 Rules) at 292, 332.  Given their breadth of holdings, these institutional investors (or the investment advisers that they retain) must vote in "potentially

---

[1] Pursuant to Sixth Circuit Rule 28(a)(1), this brief's district court record citations are to the Page ID number of the cited record entry.

hundreds, if not thousands, of shareholder meetings and on thousands of proposals that are presented at these meetings each year." *Id.* at 292. Most of these votes are concentrated in a period of a few months from mid-March to early June called the "proxy season." *Id.* And in each matter, institutional investors generally have fiduciary obligations to vote in the best interest of the customers on whose behalf their shares are held. *See* R. 35-50 (*Concept Release on the U.S. Proxy System*, 75 Fed. Reg. 42,982 (July 22, 2010)) (Concept Release) at 1281 & n.238; 17 C.F.R. 275.206(4)-6.

Institutional investors have increasingly turned to PVABs for help in making these voting determinations. R. 35-2 (2020 Rules) at 292. PVABs provide research and analysis on matters subject to a vote, as well as specific voting recommendations based upon client objectives. *Id.* PVABs may also assist in handling the administrative tasks of the voting process by, for example, enabling clients to efficiently cast votes on an electronic platform or, in some cases, directly executing votes on their behalf. *Id.* PVABs typically have a matter of weeks to formulate and distribute their advice in time for clients to decide and enter their votes, which may be changed at any time prior to the meeting date. *Id.* at 318 n.342, 345 n.607.

PVABs play a critical role in the proxy voting process, "help[ing] facilitate the participation of shareholders in corporate governance through the exercise of their voting rights." *Id.* at 293. Investors' ability to fulfill their proxy voting obligations "depend[s] on [their] receiving independent proxy voting advice in a timely manner."

*See* R. 35-21 (*Proxy Voting Advice*, 87 Fed. Reg. 43,168 (July 19, 2022)) (2022
Amendments) at 733.  Registrants may respond to PVAB advice by publicly filing
additional soliciting materials with the Commission in much the same manner as they
file the original proxy materials.  *Id.* at 734.

### B.    Statutory and Regulatory Background

Section 14(a) of the Securities Exchange Act of 1934 makes it unlawful for any
person to "solicit . . . any proxy" with respect to certain securities "in contravention of
such rules and regulations as the Commission may prescribe as necessary or
appropriate in the public interest or for the protection of investors."  15 U.S.C.
78n(a)(1).  These rules and regulations define "solicitation" and other relevant terms
(Rule 14a-1), require that a person engaged in solicitation furnish to each person
solicited a written proxy statement containing certain mandatory disclosures and file
the statement with the Commission (Rules 14a-3 to 14a-15 and 14a-19), establish
exemptions from those information and filing requirements (Rule 14a-2), and prohibit
misstatements or omissions of material fact in proxy solicitations (Rule 14a-9), among
other things.  17 C.F.R. 240.14a-1, *et seq.*

The Commission has long considered proxy voting advice generally to be a
form of "solicitation" subject to the proxy rules, including Rule 14a-9's antifraud
proscriptions.  *See* R. 35-50 (Concept Release) at 1281-82.  But PVABs also have long
been eligible for two conditional exemptions from the proxy rules' information and

filing requirements.  R. 35-2 (2020 Rules) at 340.  Without such an exemption, those requirements would necessitate significant changes to PVABs' existing operations and business models.  *Id.* at 294.

### C.    Proceedings Before the Commission

#### 1.    The Commission adopted the 2020 Rules by a divided vote.

In July 2020, by a 3-1 vote, the Commission adopted amendments to its proxy rules.  The 2020 Rules codified the Commission's view that proxy voting advice by PVABs generally constitutes a "solicitation" under the proxy rules.  *Id.* at 363.  They also conditioned PVABs' exemption from the proxy rules' information and filing requirements on compliance with three new requirements.  To qualify for an exemption, PVABs had to:

(1)    make certain conflicts-of-interest disclosures (the conflicts-disclosure condition); and

(2)    adopt policies and procedures reasonably designed (a) to make their advice available to the registrant that is the subject of the advice at or before the time the advice is disseminated to their clients and (b) to provide clients a mechanism by which they can reasonably be expected to become aware of any written response the registrants might subsequently file in a timely manner before the meeting (collectively, the notice-and-awareness conditions).  *Id.*

The Commission also adopted two "safe harbor" provisions to give PVABs "greater legal certainty" in complying with the notice-and-awareness conditions.  *Id.* at 322, 363.  To satisfy the safe harbor provisions, a PVAB was required to send its clients at least one notice, and potentially two separate notices, regarding the

registrant's intent to file and actual filing of a written response, including a hyperlink to the registrant's response. *Id.* at 322-23 & n.381. Finally, in an attempt to clarify its application, the 2020 Rules added explanatory Note (e) to Rule 14a-9's antifraud provisions, giving specific examples of material misstatements or omissions related to proxy voting advice. *Id.* at 364.

As originally proposed in 2019 (by a 3-2 vote), the rules would have required that PVABs allow registrants to review and provide feedback on their advice *before* disseminating it to their clients and include in the advice a hyperlink to the registrant's response. *Id.* at 311. But the Commission acknowledged in 2020 that investors overwhelmingly opposed those measures, arguing that they would have particularly detrimental effects on the cost, timeliness, and independence of proxy advice that were not justified by credible evidence that errors in proxy advice occur frequently. *Id.* at 312-15. A majority of the Commission's Investor Advisory Committee ("IAC"), an advisory body established by Congress in 2010 (15 U.S.C. 78pp), argued that there was "no reliable basis for concluding material problems [with proxy advice] actually do exist" or that "government-mandated regulations of the type proposed" are justified. R. 60-1 (IAC Recommendation) at 1630-31.

In adopting the notice-and-awareness conditions in 2020, the Commission acknowledged that commenters disagreed about the incidence of errors in proxy advice and that the evidence on both the quality and influence of such advice was

"inconclusive." R. 35-2 (2020 Rules) at 312-13, 316, 333-34. Accordingly, the Commission made no finding that the conditions were "necessary" to address any material deficiency in proxy advice or in the information currently available to investors. *Contra* Br. 15, 56. Rather, it explained that the conditions were "designed to promote the reliability and completeness of information available to investors" going forward by "facilitating investor access to enhanced discussion of proxy voting matters." R. 35-2 (2020 Rules) at 316. At the same time, the Commission concluded that the conditions would "impose lower compliance costs and result in fewer disruptions for [PVABs] and their clients" than the proposal, and that the changes to the proposal would also "limit the presence and ameliorate the possible effects of the independence-related concerns raised by commenters." *Id.* at 346, 350.

The Commission explained that it lacked the data necessary to estimate these benefits and costs. *Id.* at 342, 344, 345-46. Instead, recognizing the "wide range of opinions and competing views" in this area, the Commission qualitatively balanced the potential informational benefits against the mitigated risks and made a policy judgment that it would be "appropriate" to adopt the conditions. *Id.* at 316, 350, 351.

The dissenting Commissioner disagreed with that judgment, arguing that the notice-and-awareness conditions still "impose significant new costs and delays" and "increase issuer involvement in what is supposed to be independent advice" despite

13

"almost universal opposition from investors . . . who have emphatically stated that no rule is needed or wanted."  R. 60-2 (Dissent of Commissioner Lee) at 1648-49.

On the same day, the Commission also issued guidance "to assist investment advisers in assessing how to consider the additional information that may become more readily available to them as a result of [the 2020 Rules]."  R. 35-13 (*Supplement to Commission Guidance Regarding Proxy Voting Responsibilities of Investment Advisers*, 85 Fed. Reg. 55,155 (Sept. 3, 2020)) (2020 Supplemental Guidance) at 661.  This guidance supplemented guidance issued the year before to assist investment advisers in complying with their proxy voting responsibilities.  *Commission Guidance Regarding Proxy Voting Responsibilities of Investment Advisers*, 84 Fed. Reg. 47,420 (Sept. 10, 2019).[2]

### 2.    The Commission reconsidered its policy judgment and, after notice and comment, rescinded parts of the 2020 Rules.

On June 1, 2021, the new Commission Chair issued a statement directing the staff to consider whether the Commission should revisit the 2020 Rules.  R. 35-16 (*Statement on the Application of the Proxy Rules to Proxy Voting Advice* (June 1, 2021)) at

---

[2] Institutional Shareholder Services Inc. ("ISS"), a leading PVAB, challenged the 2020 Rules.  *Institutional S'holder Servs. Inc. v. SEC*, No. 1:19-cv-3275 (D.D.C.).  ISS argued that the Commission lacks authority under Section 14(a) to regulate proxy advice and that the 2020 Rules were arbitrary and capricious under the APA and violated the First Amendment.  After the notice-and-awareness conditions were rescinded, ISS reaffirmed its challenge to the 2020 Rules' definition of solicitation and conflicts-disclosure condition.  Cross-motions for summary judgment are pending.

692.[3]  On November 17, 2021, the Commission proposed (by a 3-2 vote) to rescind

the notice-and-awareness conditions and to delete Note (e) to Rule 14a-9, while

retaining the codification of the Commission's interpretation of solicitation and the

conflicts-disclosure condition.  R. 35-17 (*Proxy Voting Advice*, 86 Fed. Reg. 67,383

(Nov. 26, 2021)) (2021 Proposed Amendments).  The proposal was published on the

Commission's website the same day, and plaintiffs issued a press release opposing it

that day.  R. 60-18 (U.S. Chamber Statement) at 1737.  The comment period closed

on December 27, 2021.  R. 35-17 (2021 Proposed Amendments) at 694.

After considering comments, the Commission adopted the proposed

amendments (by a 3-2 vote) on July 13, 2022.  R. 35-21 (2022 Amendments) at 726.

The Commission explained that the 2020 Rules "reflected an effort to balance

competing policy concerns," including its interests in "facilitating more informed

proxy voting decisions" while avoiding "adverse effects on the cost, timeliness, and

---

[3] Also on June 1, 2021, the staff of the Commission's Division of Corporation
Finance issued a statement that the Division would not recommend enforcement
action to the Commission based on the 2020 Rules during the period in which the
Commission considered further regulatory action.  R. 35-14 (*Statement on Compliance*
(June 1, 2021)) at 666.  Although the Commission rescinded that staff statement when
it adopted the 2022 Amendments, R. 35-21 at 727 n.18, a district court ruled in a
separate case that the staff statement, combined with the Chair's statement and a
related filing in the ISS litigation, constituted final agency action unlawfully
suspending the compliance date of the 2020 Rules.  *Nat'l Ass'n of Mfrs. v. SEC*, 631 F.
Supp. 3d 423 (W.D. Tex. 2022).  The same district court later rejected an APA
challenge to the 2022 Amendments.  *Nat'l Ass'n of Mfrs. v. SEC*, 2022 WL 17420760
(W.D. Tex. Dec. 4, 2022).

independence of proxy voting advice." *Id.* at 727-28. The Commission "revisited" its weighing of these concerns and struck a different "policy balance." *Id.* at 728. It was not persuaded that there are systemic inaccuracies in proxy advice, and it agreed with "the vast majority of PVABs' clients and investors that expressed views" that "the potential informational benefits" of the conditions "do not sufficiently justify the risks they pose to the cost, timeliness, and independence of proxy voting advice on which many investors rely." *Id.* at 733 & n.124.

The Commission also concluded that Note (e) had exacerbated, rather than alleviated, legal uncertainty and should be deleted. *Id.* at 739. And it rescinded the 2020 Supplemental Guidance. *Id.* at 736.

### D.    Proceedings Before the District Court

Plaintiffs challenged the 2022 Amendments on substantive and procedural APA grounds. The district court denied plaintiffs' motion for summary judgment and granted summary judgment in favor of the Commission. R. 74 (Mem. Op.).

The district court concluded that the Commission provided a reasoned explanation for "step[ping] back from its earlier position" and "balancing . . . the various costs and benefits" of the conditions differently than it did in 2020. *Id.* at 2035, 2038-39, 2041. In particular, the Commission "fully identified and explained the concerns on both sides of the issue" and "explained why, on balance, it preferred one option to the other." *Id.* at 2039, 2041. Plaintiffs' contrary arguments, the court

concluded, rested on the erroneous premise that the Commission "was required not simply to explain why it departed from its earlier path, but to convincingly refute its earlier conclusions." *Id.* at 2037-38.

The district court also rejected plaintiffs' argument that the Commission contradicted its prior conclusion that the 2020 Rules "d[id] not create the risk that [proxy voting] advice would be delayed or that the independence thereof would be tainted *as a result of a registrant's pre-dissemination involvement*." *Id.* at 2041 (quoting R. 35-2 (2020 Rules) at 321). Plaintiffs' account was "misleading" because they "omit[ted] the final eight words of the relevant sentence in order to create the false impression that the SEC was suggesting that notice-and-awareness posed no risks whatsoever of causing delays or compromising independence for any reason." *Id.* at 2040-41. That was "not what the SEC said, and it was, accordingly, not something that the SEC needed to repudiate." *Id.* Similarly, the court concluded that plaintiffs' argument that the Commission changed its position on the efficacy of PVABs' voluntary practices without explanation "cannot be squared with the record." *Id.* at 2039.

The district court rejected plaintiffs' objections to the Commission's economic analysis, explaining that it is "not true that the 2022 rulemaking ignored the downside of repealing the notice-and-awareness condition[s]," as plaintiffs argued. *Id.* at 2031. Rather, the Commission "simply was not persuaded by [those concerns]" and "explained why." *Id.* at 2032. And the court concluded that the record "gave [the

17

Commission] no choice but to engage in a qualitative analysis" of the economic effects. *Id.* at 2032 (quotation omitted).

In addition, the district court rejected plaintiffs' claim that the comment period for the 2022 Amendments was inadequate. The court explained that "the parties on all sides of the[] issues were well-prepared to comment quickly and effectively" given the "years of analysis that had already been devoted to the[] issues" and the fact that "little had changed between 2020 and 2022." *Id.* at 2028-29. Because "numerous detailed arguments in favor of and against the notice-and-awareness condition[s] had already been assembled," the court observed, "interested parties had little need to formulate arguments from scratch." *Id.* at 2029. In these circumstances, "30 days was a sufficient period of time for commenters to formulate and provide their views on the proposal, which is what the APA requires." *Id.* at 2030.

## SUMMARY OF ARGUMENT

1. The Commission reasonably explained its policy choice to rescind the notice-and-awareness conditions.

a. The Commission offered good reasons for weighing the conditions' uncertain, unquantifiable benefits and risks differently than it did in 2020, including the overwhelming opposition of the conditions' intended beneficiaries, lack of evidence of systemic inaccuracies in proxy advice, significance of the consequences if

the timeliness or independence of proxy advice were to be impaired, and pre-existing mechanisms that facilitate registrant responses to such advice.

b.  Contrary to plaintiffs' contention, the Commission specifically identified the risks that the conditions pose to the cost, timeliness, and independence of proxy advice.  Those risks are substantiated by comments from a range of stakeholders and were also acknowledged and weighed by the Commission when it originally adopted the conditions.

c.  Nor is there any merit to plaintiffs' contention that the Commission contradicted prior factual findings and thus had to provide a more detailed justification.  In arguing that the Commission in 2020 found the conditions posed no risk to timeliness or independence at all, plaintiffs rely on a single statement addressing specific concerns arising from the discarded advance review process—not the risks considered by the Commission in 2022—while simply ignoring other statements demonstrating that the Commission believed it had mitigated, not eliminated, the overall risks.  And their claim that the Commission changed its view of the facts regarding PVABs' voluntary practices is similarly belied by the record.

d.  Plaintiffs' objections to the Commission's economic analysis are equally meritless.  Contrary to their assertions, the Commission's discussion of PVABs' voluntary practices is consistent with its determination that rescinding the conditions will reduce PVABs' costs.  The Commission reasonably observed that because

19

PVABs have existing practices that go some way towards complying with the conditions, the magnitude of the savings of rescission will vary based on each PVAB's practices. The Commission also reasonably considered the costs of rescinding the conditions. It acknowledged that doing so could reduce registrants' ability to timely identify and respond to errors in proxy advice but, weighing the uncertain costs and benefits, rationally concluded that rescission was nonetheless appropriate.

2.a. The Commission satisfied its obligation to provide a meaningful opportunity for public comment. The comment period exceeded the length that courts have indicated is generally sufficient to elicit meaningful comment even for substantial rule changes. And the comment period *did* elicit meaningful comment. The Commission received dozens of comments from supporters and opponents of the conditions raising all of the issues plaintiffs advanced here. Despite plaintiffs' unfounded speculation, there is no evidence that any interested parties were unable to comment or to present relevant information to the Commission.

b. In any event, any notice-and-comment deficiency was plainly harmless to plaintiffs. They received notice when the proposal was published on the Commission's website 40 days before the comment period closed, submitted extensive comments, and have not identified any additional arguments or specific evidence they would have offered if given more time. Courts have consistently found notice-and-comment violations harmless in similar circumstances.

3.   Plaintiffs incorrectly assert that the proper remedy for their claims would be to vacate the 2022 Amendments.  Even if this Court were to agree with plaintiffs on the merits, the appropriate remedy would be remand without vacatur.  The Commission almost certainly would be able to correct any deficiency on remand.  And any remedy should be limited to the notice-and-awareness conditions.  The Commission expressly intended for their rescission to be severed from its other actions if invalidated, and there is no question that the conditions could function sensibly without explanatory Note (e) and the 2020 Supplemental Guidance.

## ARGUMENT

## I.   The 2022 Amendments were reasonable and reasonably explained.

This Court reviews *de novo* the district court's summary judgment ruling rejecting plaintiffs' APA claims.  *City of Cleveland v. Ohio*, 508 F.3d 827, 838 (6th Cir. 2007).  Under the APA's "deferential" arbitrary-and-capricious standard, "[a] court simply ensures that the agency . . . has reasonably considered the relevant issues and reasonably explained the decision."  *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).  "Even when an agency explains its decision with less than ideal clarity, a reviewing court will not upset the decision on that account if the agency's path may

reasonably be discerned." *Oakbrook Land Holdings, LLC v. Comm'r*, 28 F.4th 700, 720 (6th Cir. 2022) (quotation omitted).

Contrary to plaintiffs' assertion (at 4), an agency's change in policy "is not subjected to a heightened standard or more substantial review than the scrutiny applicable to policy drafted on a blank slate." *Handley v. Chapman*, 587 F.3d 273, 282 (5th Cir. 2009). The APA "imposes no heightened obligation on agencies to explain 'why the original reasons for adopting the displaced rule or policy are no longer dispositive.'" *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 376 (D.C. Cir. 2013) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009)). Nor are agencies required to identify "new evidence" or a "change in circumstances." *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1037-38 (D.C. Cir. 2012) (quotation omitted); *accord Clean Water Action v. EPA*, 936 F.3d 308, 315 (5th Cir. 2019). Rather, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Fox*, 556 U.S. at 515.

The 2022 Amendments clear *Fox*'s "low bar." *Inv. Co. Inst.*, 720 F.3d at 377. Plaintiffs do not dispute that retaining or rescinding the notice-and-awareness conditions were both statutorily permissible policy options. *See* 15 U.S.C. 78n(a)(1). In 2020, a divided Commission concluded that the conditions' potential benefits justified any adverse effects. In 2022, the Commission forthrightly acknowledged, in

a considered release issued after notice and comment, that it had "revisited" that policy judgment and, "weigh[ing] the[] competing concerns differently," reached a different conclusion.  R. 35-21 (2022 Amendments) at 727-28, 733.  And it provided a reasoned explanation for this policy shift.  Plaintiffs' contrary arguments either ignore, misunderstand, or mischaracterize the Commission's analysis and the district court's reasoned opinion.

## A.     The Commission provided a reasoned explanation for weighing the competing policy concerns differently than it did in 2020.

Consistent with its obligation under *Fox*, the Commission acknowledged in rescinding the notice-and-awareness conditions that it weighed the uncertain, unquantifiable benefits and risks differently than it had in 2020 and offered "good reasons" for doing so.  556 U.S. at 515.  The Commission explained that it was "revisit[ing]" the balance it had struck between "facilitating more informed proxy voting decisions" and limiting "risks . . . to the cost, timeliness, and independence of proxy voting advice."  R. 35-21 (2022 Amendments) at 727-28.  It discussed the comments from both sides addressing the justifications for and potential adverse effects of the conditions.  *Id.* at 729-32.  It explained that, as in 2020, it was unable to quantify these economic effects.  *Id.* at 743-44.  And it made a policy judgment that, upon reconsideration, "the potential informational benefits to investors of the

[conditions] do not sufficiently justify the risks they pose to the cost, timeliness, and independence of proxy voting advice on which many investors rely." *Id.* at 733.

In reaching that judgment, the Commission reasonably considered it significant that, despite having dropped the controversial advance review process in 2020, the conditions were still strongly opposed by the vast majority of investors and PVAB clients they were intended to benefit—many of whom depend on accurate, timely, and independent proxy advice and may themselves be subject to an investment adviser's fiduciary duty when making voting decisions. *Id.* at 727-28, 733, 745. The Commission took their cost, timeliness, and independence concerns seriously because of "the important role that PVABs play in the proxy voting process and the scope of the potential consequences should that role be disrupted." *Id.* at 735; *see also id.* at 734 n.139 (explaining that any delays "could impair the ability of PVABs' clients to receive and process . . . advice sufficiently in advance" of the vote).[4]

Balancing these risks against the potential benefits, the Commission explained that it did not believe there was "persuasive evidence" of any systemic deficiencies in proxy voting advice that "establish[ed] the necessity of the . . . conditions." *Id.* at 733-

---

[4] Contrary to plaintiffs' claim (at 3, 16) that retail investors "overwhelmingly supported" the conditions, "no such investors submitted comments opposing the proposed rescission" and the survey they cite was criticized for "us[ing] leading questions" and showing only that "retail investors are generally uninformed" about the proxy advice market. R. 35-21 (2022 Amendments) at 733 n.124 (quotation omitted).

34 & n.127.  The Commission noted that, in 2020, it had considered much of the evidence of deficiencies cited by the conditions' supporters in 2022, had found it to be disputed, and had declined to make a finding about the prevalence of errors in proxy advice, instead adopting the conditions on a different rationale.  *Id.*  It concluded that the same evidence did not necessitate retaining the conditions; to the contrary, "the error rate in proxy voting advice appears to be low."  *Id.* at 745.[5]

For example, the Commission pointed out that the American Council for Capital Formation ("ACCF") study relied on by many of the conditions' supporters showed that "only 0.90% of all registrants disputed a PVAB's proxy voting advice in supplemental filings in 2021, which is only a 0.11% increase" from 2020.  *Id.* at 731, 733-34 n.127; *see also id.* at 745 (noting that these filings "represented less than one percent of the proxy materials filed by registrants that year").  And even these percentages "may not reflect the error rates in proxy voting advice, as the fact that a registrant raises a dispute regarding proxy voting advice in a supplemental filing does not necessarily indicate that an error exists in such advice."  *Id.* at 733-34 n.127; *see also id.* at 730 n.58 (noting that "much of the registrant feedback [one institutional investor] had observed 'involve[d] differences of opinion'"); R. 60-17 (Council of

---

[5] Many comments support this assessment.  *See, e.g.*, R. 60-12 (T. Rowe Price Comment) at 1697; R. 60-13 (Washington State Investment Board Comment) at 1699; R. 60-14 (OPERS Comment) at 1705; R. 60-15 (CalPERS Comment) at 1710.

Institutional Investors 2019 Comment) at 1725-26 (arguing that only 18 of 39 claimed errors in ACCF study were actual factual inaccuracies, out of 31,830 PVAB reports).[6]

Nor was the Commission persuaded to retain the conditions based on the Society for Corporate Governance survey that plaintiffs cite (at 12).  The Commission reasonably concluded that this survey was not a "persuasive indicator[] of systemic inaccuracies" as it did not "identif[y] any specific instances of errors in proxy voting advice."  R. 35-21 (2022 Amendments) at 733 & n.127 (noting that the Commission in 2020 did not rely on the survey as evidence of the prevalence of errors); *see also* R. 35-2 (2020 Rules) at 312 n.258 (citing disputes over the "rigor" and "usefulness" of such surveys).

In weighing the relative interests, the Commission also considered that registrants will continue to have some ability to access and respond to proxy advice. The Commission explained that rescission would not alter the pre-existing mechanisms registrants have long had to communicate with shareholders in the proxy process.  R. 35-21 (2022 Amendments) at 734.  It pointed to evidence that registrants have been able to identify purported factual or analytical errors in proxy advice and respond using these pre-existing mechanisms.  *Id.*  And it observed that "leading

---

[6] Contrary to plaintiffs' assertion (at 57), the Commission did not "assume[] that all errors [in proxy advice] are caught and corrected."  *See* R. 35-21 (2022 Amendments) at 745 (recognizing that the conditions may help registrants better identify errors in proxy advice).  Rather, it reasonably concluded that the ACCF study does not support claims that the error rate is high.  *Id.*

PVABs have voluntarily adopted practices that provide their clients and registrants with some of the opportunities and access to information that would have been required" under the 2020 Rules, even if these practices "do not replicate" or "result in the same benefits" as the conditions.  *Id.* at 734-35, 747.

Moreover, the Commission emphasized that rescinding the conditions would not leave proxy advice unregulated.  On the contrary, PVABs remain subject to liability under Rule 14a-9 for any misstatements or omissions of material fact in their advice and also have to disclose conflicts of interest.  *Id.* at 728, 736.  And finally, the Commission explained that there was no evidence that the conditions had "engendered significant reliance interests."  *Id.* at 735-36, 746.

Plaintiffs ignore virtually all of this explanation and instead criticize the district court for concluding that the "thoroughness of the 2020 record" justified a "less reason[ed]" analysis in 2022.  Br. 4, 53.  That deeply distorts both the district court's reasoning and the Commission's analysis.  The court reasonably explained that the 2020 record included information that "did not need to be repeated in order for the 2022 policy analysis to be sufficiently thorough."  R. 74 (Mem. Op.) at 2037.  But in assessing the sufficiency of that analysis, the court focused on what the Commission said in 2022.  *Id.* at 2037-43.  The Commission's thorough discussion satisfied its obligation under *Fox* "to explain why it departed from its earlier" policy by

27

"acknowledg[ing] the arguments for and against its proposed course of action and explain[ing] why, on balance, it preferred one option to the other." *Id.* at 2037, 2041.

### B.    The Commission reasonably concluded that the conditions pose risks to the cost, timeliness, and independence of proxy voting advice.

Plaintiffs erroneously contend (at 46-48) that the Commission "never explained" why requiring PVABs to share advice with registrants and clients simultaneously could adversely affect the cost, timeliness, and independence of that advice, arguing that there is "[no] apparent reason" it would. These arguments are unavailing.

As an initial matter, the notice-and-awareness conditions require PVABs to do more than simply give a copy of their advice to registrants. The whole purpose of the *notice* condition was to facilitate registrants' responses to PVABs' advice, which the *awareness* condition then requires PVABs to help disseminate to their clients. *See* R. 35-2 (2020 Rules) at 317, 322. PVABs relying on the safe harbors would have had to send at least one and possibly two separate notices to clients about each registrant's response, including a hyperlink to the response. *Id.* at 322-23 & n.381; *see also* R. 60-2 (Dissent of Commissioner Lee) at 1649 (highlighting these requirements).

The Commission rationally concluded that these new requirements posed risks to the cost, timeliness, and independence of proxy advice, which are readily discerned from its discussion and the record. *See Oakbrook Land Holdings*, 28 F. 4th at 720-21.

28

The Commission pointed to the specific comments, and the specific reasoning within those comments, that identified each risk.  And the concerns it credited were expressed by a broad collection of stakeholders—including many of the conditions' intended beneficiaries—and were ones that it had previously recognized and weighed when adopting the conditions in 2020.  *See Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1142-43 (D.C. Cir. 2022) (upholding Commission's reliance on comments to substantiate a potential future risk); *Stilwell v. Office of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009) (upholding agency judgment that "found support in various comments").  Plaintiffs' assertion (at 20, 48-49) that the Commission merely relied on "unsubstantiated assertions" from "self-interested parties" in considering risks is thus meritless.

### 1.     The Commission reasonably identified the risk of higher costs for proxy voting advice.

In adopting the 2020 Rules, the Commission acknowledged that PVABs "may pass through a portion of the costs of modifying or developing systems to meet the [notice-and-awareness conditions'] requirements to their clients through higher fees for proxy advice."  R. 35-2 (2020 Rules) at 348.  It reached the same conclusion in this rulemaking, R. 35-21 (2022 Amendments) at 744, reasonably crediting commenters' concern that the conditions would "increase compliance costs which get passed on to [PVABs'] clients," *id.* at 729, 733 & n.118.  *See also, e.g.*, R. 60-6 (Managed Funds

Association Comment) at 1670; R. 60-7 (Investment Adviser Association Comment) at 1675; R. 60-8 (New York Comptroller Comment) at 1682.

### 2.     The Commission reasonably identified the risk to the timeliness of proxy voting advice.

In 2020, the Commission also recognized that PVABs face significant time constraints and logistical challenges during the three-month period when most annual shareholder meetings are held. *See* R. 35-2 (2020 Rules) at 316, 319, 322. The Commission thus acknowledged, both in proposing and adopting the 2020 Rules, that imposing new regulatory burdens in this narrow timeframe necessarily involves some risk of disrupting the delivery of proxy advice. *See id.* at 316 (acknowledging "the risk that introducing new rules . . . could inadvertently disrupt the [proxy] system"); R. 35-1 (*Amendments to Exemptions From the Proxy Rules for Proxy Voting Advice*, 84 Fed. Reg. 66,518 (Dec. 4, 2019)) at 263, 264 (balancing the benefits of requiring PVABs to provide "a means for [their] clients to access a [registrant's] response to [their] recommendations" against the "costs and potential logistical complications").

As comments from investors and PVABs explained, the 2019 proposal posed an especially high risk of disruption because it would have required PVABs to set aside time for registrants to review and provide feedback on their advice before delivering it to clients. *See* R. 35-2 (2020 Rules) at 313-14, 316. In response to this concern, the Commission dropped the advance review process from the final

conditions in 2020, concluding that, as a result, the conditions would cause "fewer disruptions" for PVABs than the proposal. *Id.* at 346.

In 2022, the Commission considered that residual risk to timeliness as a factor in the policy balance. It specifically highlighted the concern that the "additional compliance burdens" imposed by the conditions—which included monitoring and potentially having to send clients notice of multiple events—could "disrupt[] the preparation and delivery of proxy voting advice" to PVABs' clients given that PVABs "may engage with hundreds of issuers regarding thousands of shareholder proposals during a critical shareholder season." R. 35-21 (2022 Amendments) at 729 & n.44, 733 & n.118 (quotation omitted). Nor was this an isolated concern. Both major PVABs and nearly a dozen large investors and investor groups warned that the conditions could affect the timeliness of proxy advice. *Id.* at 729 & n.44.

### 3.    The Commission reasonably identified the risk to PVAB independence.

The record in the 2020 rulemaking established at least two sources of risk to PVAB independence. First, the proposed advance review process gave registrants an opportunity to pressure PVABs into changing their advice before it was delivered to clients. *See* R. 35-2 (2020 Rules) at 313 & n.269, 321. Second, both the advance review process and the proposed requirement that PVABs convey registrant responses to clients "increase[d] the costs of the proxy advice that opposes management." *Id.* at 313 n.268, 348. The Commission concluded that by replacing

31

the advance review process with concurrent delivery, the notice-and-awareness conditions would "substantially address, if not eliminate altogether" the first concern. *Id.* at 347-48. And it concluded that the conditions "mitigate[d]" the second concern by imposing "lower" compliance costs than the proposal. *Id.* at 348; *see also id.* at 350 (noting that the final rules "ameliorate[d] . . . independence-related concerns").

It was this residual risk to PVAB independence that the Commission considered in 2022. Specifically, the Commission pointed to investor concern that PVABs "may feel pressure to tilt voting recommendations in favor of management more often, to avoid critical comments from companies" that they would then have to convey to their clients. R. 35-21 (2022 Amendments) at 733 & n.118 (quotation omitted). The Commission explained that PVABs may instead choose to "err[] on the side of caution in complex or contentious matters," which could "impair the independence of proxy voting advice," "reduce the diversity of thought in the market for proxy voting advice," and erode "investors' confidence in the integrity of such advice." *Id.* at 747.

Despite plaintiffs' cursory dismissal of these concerns (at 49-50), the Commission acted rationally in considering them. PVAB independence from registrants is critical to investors because investors rely on PVAB advice in deciding whether to give registrants proxy authority to vote on their behalf. *See id.* at 733; R. 60-1 (IAC Recommendation) at 1632, 1641. Yet the conditions would have

PVABs serve as conduits for disseminating registrants' (and only registrants') publicly available views to their clients. *See* R. 60-9 (NASAA Comment) at 1686-87. And advice that opposes management is more likely to prompt a registrant response, thus triggering the burdens associated with helping to disseminate it. *See* R. 35-2 (2020 Rules) at 313 n.268, 348. It is hardly "remarkable" (Br. 49) that this kind of regulation could create a risk to PVAB independence.[7]

### C.   The Commission did not contradict any prior factual findings and thus no "more detailed justification" was required.

Plaintiffs argue (at 43-45) that "a more detailed justification" (*Fox*, 556 U.S. at 515) was required based on the erroneous contention that the Commission contradicted prior factual findings regarding the risks to timeliness and independence and the effectiveness of PVABs' voluntary practices. But the Commission simply reconsidered "which policy would be better in light of the facts." *Clean Water Action*, 936 F.3d at 315 (quotation omitted). Such a "reevaluation . . . is well within an agency's discretion even when the agency offer[s] no new evidence to support its decision." *Id.* (quoting *Nat'l Ass'n of Home Builders*, 682 F.3d at 1038).

---

[7] Numerous commenters agreed. *See, e.g.*, R. 60-9 (NASAA Comment) at 1686; R. 60-10 (ICGN Comment) at 1689; R. 60-14 (OPERS Comment) at 1703; R. 60-8 (New York Comptroller Comment) at 1682.

### 1. The Commission did not reject any prior factual findings regarding the risks to timeliness and independence.

Plaintiffs first assert (at 43-44, 47) that the Commission made a factual finding in 2020 that the notice-and-awareness conditions "would *not* threaten the timeliness or independence of proxy advice." That is simply incorrect. They point to a single statement from the 2020 release:

> [B]ecause [the notice-and-awareness conditions] do[] not require [PVABs] to adopt policies that would provide registrants with the opportunity to review and provide feedback on their proxy voting advice before such advice is disseminated to clients, the rule does not create the risk that such advice would be delayed or that the independence thereof would be tainted *as a result of a registrant's pre-dissemination involvement*.

R. 35-2 (2020 Rules) at 321 (emphasis added).

This statement addresses only the risks arising from "a registrant's pre-dissemination involvement" in proxy advice. *Id.* It does not consider, let alone reject, the distinct risks acknowledged elsewhere in the 2020 release and considered by the Commission in 2022. *See supra* 30-33. And plaintiffs' interpretation is further belied by multiple statements in the 2020 release recognizing that the conditions had mitigated, not eliminated, the overall risks to timeliness and independence. *See, e.g.,* R. 35-2 (2020 Rules) at 346 (conditions would "result in *fewer* disruptions for [PVABs] and their clients"); *id.* at 350 (changes would "*help*[] address" and "*limit* the presence and *ameliorate* the possible effects of" commenters' "independence-related concerns") (emphases added).

34

The cases cited by plaintiffs (at 46) are thus inapposite.  In *Wages & White Lion Investments, L.L.C. v. FDA*, 16 F.4th 1130, 1139 (5th Cir. 2021), the agency contradicted itself on the factual question whether the disposability of e-cigarettes affects the risk they pose to youths.  In *Organized Village of Kake v. USDA*, 795 F.3d 956, 968-69 (9th Cir. 2015), the agency's factual finding that a rule exemption posed only "minor" risks contradicted its detailed prior findings that the risks were "prohibitive."  And in *Air Alliance Houston v. EPA*, 906 F.3d 1049, 1067 (D.C. Cir. 2018), the agency delayed the effective and compliance dates of a rule without addressing its detailed justifications for those dates.

Here, by contrast, there are no inconsistent "factual determination[s]" (Br. 46) regarding the existence or magnitude of the risks to timeliness and independence.  There is only a difference in how the conditions' uncertain benefits and risks should be balanced.  That type of policy shift does not require a "heightened justification" (Br. 42).  *See, e.g.*, *Organized Vill. of Kake*, 795 F.3d at 968; *Clean Water Action*, 936 F.3d at 315; *Nat'l Ass'n of Home Builders*, 682 F.3d at 1038.[8]

---

[8] The district court thus erred in characterizing the Commission's revised "balancing of the various costs and benefits" in light of investor "feedback" as a "factual" contradiction.  R. 74 (Mem. Op.) at 2035-36.  But the court nonetheless applied the proper standard and correctly concluded that the Commission satisfied it.  *Id.* at 2036, 2041.  And in any event, the court persuasively demonstrated that the Commission *did not* contradict itself on either of the two factual questions on which plaintiffs base their argument that a heightened justification was required.  *Id.* at 2039-41.

### 2. The Commission did not reject any prior factual findings regarding PVABs' voluntary practices.

Plaintiffs' argument (at 44-45, 50-52) that there are unexplained factual inconsistencies in the Commission's consideration of PVABs' voluntary practices fares no better. In 2020, the Commission did not conclude that the conditions were "needed in light of PVABs' voluntary practices." Br. 45. The Commission expressly *declined* to find that PVAB clients were basing their voting decisions on deficient advice. R. 35-2 (2020 Rules) at 316. What the Commission did say is that those voluntary practices did not "suffice to achieve [its] goal of ensuring . . . timely access to a more complete mix of relevant information." *Id.* at 317.

In 2022, the Commission did not disagree: it acknowledged that PVABs' voluntary practices "do not replicate" the notice-and-awareness conditions, that the same practices were in place when the Commission adopted the conditions in 2020, and that the practices are less effective than the conditions in facilitating registrants' responses to proxy advice. R. 35-21 (2022 Amendments) at 734 n.133, 735, 745, 747.[9] Plaintiffs thus misrepresent the Commission's reasoning in suggesting (at 6, 29, 55) that it suddenly concluded that PVABs' voluntary practices rendered the conditions "unnecessary" to achieve the informational goal it sought to promote in 2020.

---

[9] Plaintiffs observe (at 45) that ISS discontinued one of its voluntary practices, but the Commission acknowledged that change and reasonably explained why it did not undermine the rationale for rescission. R. 35-21 (2022 Amendments) at 734-35 n.142.

Rather, the Commission was not persuaded that this informational goal sufficiently justified the conditions "when balanced against the risks that those conditions present." *Id.* at 733, 735. And in changing its view on that policy question, the Commission considered it relevant that PVABs' voluntary practices provide registrants and investors at least "some of the opportunities and access to information" that the conditions required. *Id.* at 734-35; *cf.* R. 35-2 (2020 Rules) at 342, 345 (recognizing that PVABs' practices may already confer some of the benefits the conditions are intended to achieve).

Contrary to plaintiffs' arguments (at 50-51), the Commission's consideration of PVABs' voluntary practices in this limited respect was reasonable. The Commission acknowledged that it did not "know for sure whether [PVABs'] voluntary practices will continue" but reasonably explained that PVABs have "financial[]" and other "market-based" incentives to maintain such practices despite the duopolistic market, that numerous investors and PVAB clients expected PVABs to maintain them, and that, in any event, it would "continue to monitor the PVAB market" and would "take further action" if necessary. R. 35-21 (2022 Amendments) at 735 & n.151, 745-46; *see also* R. 35-2 (2020 Rules) at 334 & n.493 (citing comments discussing PVABs' incentives to provide accurate advice). And plaintiffs' mantra (at 44, 50, 51 n.4, 54) that the Commission has opted for PVAB "self-regulation" ignores that, while the Commission reconsidered one specific policy, it retained the conflicts-disclosure rules

and reiterated that PVABs are subject to other requirements, including Rule 14a-9's antifraud provisions.  R. 35-21 (2022 Amendments) at 736.

### D.    Plaintiffs' objections to the Commission's economic analysis are meritless.

The Commission fulfilled its statutory obligation to "determine as best it can the economic implications of the" 2022 Amendments.  *Lindeen v. SEC*, 825 F.3d 646, 657 (D.C. Cir. 2016) (quotation omitted); *see* R. 35-21 (2022 Amendments) at 741-48.  Plaintiffs' scattershot arguments to the contrary do not withstand scrutiny.

#### 1.    There is no inconsistency in the Commission's analysis of the benefits of rescinding the conditions.

Plaintiffs erroneously contend (at 55-56) that the Commission's discussion of PVABs' voluntary practices contradicts its determination that rescinding the conditions will reduce PVABs' costs.  The Commission recognized that existing practices provide some, but not all, of "the opportunities and access to information" required by the conditions.  R. 35-21 (2022 Amendments) at 735.  Rescission will thus save PVABs the cost of bringing their practices into compliance.  *Id.* at 744.  But, as the Commission reasonably explained, the magnitude of that cost savings will "vary depending on each PVAB's current practices":  the closer a PVAB's existing practices come to satisfying the conditions, the more "limited" the savings.  *Id.*  This is not an attempt to "have it both ways" (Br. 55) but an honest assessment of the benefits of rescission.  And it mirrors the Commission's recognition in 2020 that "the extent of

the [conditions'] benefits will depend on [PVABs'] existing practices."  R. 35-2 (2020 Rules) at 342.

Nor does the Commission's Paperwork Reduction Act ("PRA") analysis in 2022 demonstrate any inconsistency.  While the Commission was "unable to quantify the full range" of benefits, it explained that rescission would, "at a minimum," eliminate the "paperwork burden" that it had estimated the conditions would impose on PVABs.  R. 35-21 (2022 Amendments) at 744, 748; *see also id.* at 748 (explaining that PRA analysis encompasses only a subset of costs); R. 35-2 (2020 Rules) at 354 (same).  This estimate does not assume that PVABs will suddenly stop "doing *any of the things* required by [the 2020] Rule," as plaintiffs mistakenly assert (at 56).  The 2020 PRA estimate "t[ook] into consideration" PVABs' existing "systems and practices," which it recognized "could substantially mitigate" the increased paperwork burden. R. 35-2 (2020 Rules) at 356; *see also* R. 35-21 (2022 Amendments) at 744 (same).  The inverse 2022 estimate thus simply assumes that PVABs maintain those practices.

## 2.    The Commission's qualitative analysis of the costs of rescission was reasonable.

Plaintiffs likewise err in asserting (at 56-57, 59-60, 62) that the Commission had to "quantify" or "estimate" the cost of errors in proxy voting advice.  Neither the APA nor courts require the Commission to "conduct a rigorous, quantitative economic analysis" of every potential cost and benefit.  *Lindeen*, 825 F.3d at 658 (quotation omitted).  To the contrary, the Commission "need not—indeed cannot—

base its every action upon empirical data" and "may be entitled to conduct . . . a

general analysis based on informed conjecture." *Chamber of Commerce v. SEC*, 412 F.3d

133, 142 (D.C. Cir. 2005) (quotation omitted).

The evidence submitted by commenters also affects the required inquiry, as

"[t]he APA imposes no general obligation on agencies to conduct or commission their

own empirical or statistical studies." *Prometheus Radio Project*, 141 S. Ct. at 1160.  When

the Commission lacks data to quantify a cost or benefit, a qualitative discussion that

draws a "rational connection between the facts found and the choice[] made" is

sufficient.  *Lindeen*, 825 F.3d at 658 (quotation omitted).  And "when an agency's

decision is primarily predictive," the agency need only "acknowledge factual

uncertainties and identify the considerations it found persuasive." *Am. Hosp. Ass'n v.*

*Azar*, 983 F.3d 528, 536 (D.C. Cir. 2020) (quotation omitted).

As the district court found, plaintiffs' contention that the Commission "ignored

the downside" of rescinding the conditions is "simply not true."  R. 74 (Mem. Op.) at

2031.  The Commission explained that, as in 2020, it did not receive any data enabling

it to quantify the benefits (or costs) of the conditions.  R. 35-21 (2022 Amendments)

at 743-44.  But it acknowledged that rescinding them could "limit a registrant's ability

to timely identify errors and mischaracterizations in proxy voting advice" and

"reduc[e] the overall mix of information available to [PVABs'] clients." *Id.* at 745; *see*

*also id.* at 734, 747.  It weighed these potential costs against the potential benefits,

rationally concluding that rescission was appropriate based on a number of considerations. *See supra* 23-27.

Plaintiffs' argument that the Commission's choice of comment period is to blame for the lack of data is not credible. They speculate (at 38) that another month might have made all the difference, but after more than three years of rulemakings and litigation neither plaintiffs nor any other party has identified any data from which meaningful quantitative estimates could be derived. This case is thus plainly distinguishable from those plaintiffs cite. *See Bus. Roundtable v. SEC*, 647 F.3d 1144, 1150 (D.C. Cir. 2011) (Commission did "nothing" to quantify certain costs despite "readily available" data); *Chamber*, 412 F.3d at 143 (Commission failed to estimate cost "range" where it had data to quantify costs for three possible compliance methods but did not know which method would be used); *accord Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 448 (D.C. Cir. 2012) ("Appellant points to no data or study the Department ignored and thus *Business Roundtable* is of no help to its argument.").

Plaintiffs' remaining objections repeat arguments for the proposed advance review process that have little or no bearing on the conditions. They object (at 58-59) that supplemental proxy filings are not an effective means of responding to proxy advice. But with or without the conditions, "registrants would respond to proxy voting advice via a supplemental proxy filing." *See* R. 35-21 (2022 Amendments) at 734. Nor do plaintiffs explain why helping registrants catch more errors in proxy

advice would *reduce* the amount registrants spend "attempting to correct" those errors. Br. 58. In any event, the Commission recognized that the conditions may have made it easier for registrants to identify errors in and file timely responses to proxy advice— it was simply not persuaded that those benefits justified retaining the conditions given the associated risks, lack of evidence of systemic inaccuracies, and other considerations. *See* R. 35-21 (2022 Amendments) at 733-34, 745.

## II.    The 2022 Amendments were procedurally valid.

### A.    The Commission provided a sufficient opportunity for public participation.

The district court correctly rejected plaintiffs' claim that the Commission failed to provide a meaningful opportunity for public comment. R. 74 (Mem. Op.) at 2026-30. Rather than specify a minimum comment period, the APA requires that an agency "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. 553(c). Here, the Commission determined that a 30-day comment period was appropriate in light of the "targeted nature" of the amendments. R. 35-21 (2022 Amendments) at 731 n.71. And the comment period actually closed 40 days after the Commission issued the proposal on its website, and 31 days after it was published in the Federal Register.

Plaintiffs' premise (at 20, 32, 36) that this was a "truncated" comment period requiring some "exigency" or other "persuasive" justification is incorrect. Courts have long held that a comment period of at least 30 days is generally sufficient to elicit

42

meaningful comment even for substantial and complex rule changes. *See Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1117 (D.C. Cir. 2019); *Chem. Mfrs. Ass'n v. EPA*, 899 F.2d 344, 347 (5th Cir. 1990); *see also Fleming Cos. v. USDA*, 322 F. Supp. 2d 744, 764 (E.D. Tex. 2004) ("[A] thirty-day notice and comment period is sufficient."), *aff'd*, 164 F. App'x 528 (5th Cir. 2006); *Conn. Light & Power Co. v. NRC*, 673 F.2d 525, 534 (D.C. Cir. 1982) (30-day comment period for "technical[ly] complex[]" rules satisfied the APA); *cf. Coal. for Workforce Innovation v. Walsh*, 2022 WL 1073346, at *9 (E.D. Tex. Mar. 14, 2022) (19 days was not sufficient, but "a comment period of at least 30 days" would have been).

Even if it were true that courts "always" subject such comment periods to a "holistic[]" "fair[ness]" inquiry (Br. 31-32), plaintiffs identify only four rules in the history of the APA in which a comment period of 30 days or more was found insufficient. And each of those cases involved some fundamental obstacle that made meaningful comment impossible, not just potentially inconvenient for some.

In *Becerra v. Department of the Interior*, the agency refused to consider *any* substantive comments about the repealed rule. 381 F. Supp. 3d 1153, 1172, 1174-77 (N.D. Cal. 2019); *cf. Coal. for Workforce Innovation*, 2022 WL 1073346, at *9-10 (19-day period with content restriction); *N.C. Growers' Ass'n v. United Farm Workers*, 702 F.3d 755, 769-70 (4th Cir. 2012) (10-day period with content restriction). Similarly, in *Estate of Smith v. Bowen*, the agency failed to provide basic information "required for

meaningful comment" and then refused to reopen the comment period after a major government-sponsored study arguably contradicted its findings. 656 F. Supp. 1093, 1097-98, 1099 (D. Colo. 1987); *cf. Prometheus Radio Project v. FCC*, 652 F.3d 431, 449-53 (3d Cir. 2011) (notice of proposed rulemaking did not "fairly apprise interested persons of the subjects and issues before the agency" (quotation omitted)).

The only other cited cases involved highly complex and disruptive rules staggered with comment periods for interrelated rules in a way that made it impossible to assess their combined effects. *See Centro Legal de la Raza v. Exec. Off. for Immigr. Rev.*, 524 F. Supp. 3d 919, 955, 958, 962 (N.D. Cal. 2021) ("extensive changes to the immigration court system that altered long-established policy and practice" were "intertwined" with other proposed rules that obscured their "true impact"); *Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*, 2021 WL 3609986, at *1, *3 (D.D.C. Apr. 4, 2021) (considering the same "highly technical and complex" rule and "slew of interrelated rulemaking activity"); *Pangea Legal Servs. v. DHS*, 501 F. Supp. 3d 792, 798, 814, 819-22 (N.D. Cal. 2020) (rule that "change[d] asylum law," "upend[ing] decades of precedent," was "staggered" with "several other related proposed rules" that obscured its "full impact").

This rulemaking involved no such fundamental obstacle to meaningful comment. As the district court explained, the Commission reweighed, on largely the same facts, the policy arguments for and against a discrete proxy rule amendment that

did not implicate any significant reliance interests.  R. 74 (Mem. Op.) at 2028-29; *see* R. 35-21 (2022 Amendments) at 735, 736.  It provided adequate notice of its proposed action, invited and considered substantive comments, and did not stagger the proposal with any interrelated rules.  It received dozens of comments presenting all of the arguments plaintiffs raise here and, after six months of consideration, it rescinded the amendment in a reasoned release.

Tellingly, despite multiple opportunities, plaintiffs have not identified a single party that wanted to comment but was unable to, or a single additional argument that commenters would have made if the comment period had been longer.  *Cf. Centro Legal*, 524 F. Supp. 3d at 954 (public was unable to "consider[] and comment[] on the interplay of numerous intersecting policy changes"); *Pangea*, 501 F. Supp. 3d at 821 (similar); *Becerra*, 381 F. Supp. 3d at 1175-76 (no substantive comments considered at all).  Instead, they blame the comment period for the Commission's inability to quantify the costs of inaccurate proxy advice.  But the same uncertainties and data obstacles precluded quantification in 2020 as well.  *See* R. 35-2 (2020 Rules) at 342, 345-46.  Plaintiffs' speculation (at 38) that they might have come up with the elusive (and still unspecified) data if given "an additional month" is not credible.

Plaintiffs err in asserting (at 33-39) that other circumstances demonstrate that the comment period was inadequate.  In the absence of an underlying obstacle precluding meaningful comment (*e.g.*, a comment period shorter than the APA

45

minimum, a content restriction, or complex, staggered, and intertwined rulemakings), none of these circumstances—alone or in combination—renders the comment period insufficient.  No court has ever held that a comment period that—like this one— *exceeded* the APA minimum and *did* elicit meaningful comment violated the APA.

Plaintiffs contend (at 33), for example, that the comment period was "functionally" shorter than 31 days because it spanned year-end holidays.  But there is no statutory basis for subtracting holidays from comment periods (*cf.* Fed. R. Civ. P. 6(a)(1)(B)), and the only two cited cases (by the same district judge) do not suggest that the holiday overlap would have been relevant if meaningful comment had not been rendered impossible by the agency's staggering of complex, intertwined rulemakings.  And in any event, the comment period here was functionally *longer* than 31 days because the proposal was issued on the Commission's website and widely publicized nine days earlier.  *E.g.*, R. 60-18 at 1737 (Chamber press release on the proposal 40 days before close of comment period); *see Pangea*, 501 F. Supp. 3d at 820 (considering whether proposed rule was "previously published in any form" in assessing comment period's holiday overlap); *Omnipoint Corp. v. FCC*, 78 F.3d 620, 629-30 (D.C. Cir. 1996) (considering date of actual notice in assessing sufficiency of comment period).

Plaintiffs' claim (at 35) that the comment period violated the Commission's "declared policies" is also incorrect.  On May 18, 2022, Chair Gensler testified that

the Commission "endeavor[s]" to set comment deadlines at least 60 days from website (not Federal Register) publication.  R. 35-31 (Gensler Testimony) at 806.  The Chair's individual testimony does not—and could not—establish a policy binding on the full Commission in a comment period that ended months earlier.  Nor do plaintiffs' cases support its argument that the Commission must specifically explain any departure from non-binding executive branch recommendations for longer comment periods than required by the APA particularly where, as here, the comment period "provided adequate opportunity for interested parties to share their views."  R. 35-21 (2022 Amendments) at 731 n.71.

Nor does the fact that a few parties requested more time (Br. 37) establish that the comment period was insufficient to elicit meaningful comment.  *See Conn. Light & Power Co.*, 673 F.2d at 534 (agreeing that a "longer comment period might have been helpful" due to "the technical complexity of the regulations," but holding that the APA did not require more than 30 days).  Of those parties, all but one submitted extensive, substantive comments on the proposal.  And despite the Commission's established practice of considering comments received after the close of a comment period (*see* 17 CFR 202.6(b)), none submitted any additional comments.[10]

---

[10] The Commission had recently reiterated this practice in a proxy rulemaking in which plaintiffs, *amici*, and other extension-requesting commenters here participated. *See Procedural Requirements and Resubmission Thresholds Under Exchange Act Rule 14a-8*, 85 Fed. Reg. 70,240, 70,268 n.312 (Nov. 4, 2020).

Plaintiffs' argument (at 34, 38-39) that a violation can be inferred from a comparison to the longer comment period and greater number of comments received in 2020 fails for multiple reasons. Neither of the cases they cite holds that the APA requires parity when an agency repeals a rule: rather, the courts first determined that meaningful comment on a repeal was impossible (because of a content restriction in *Becerra* and a mere 10-day comment period paired with a content restriction in *North Carolina Growers' Association*) and then observed that a comparison with the number of comments received at adoption illustrated the consequences of the violation. *See Becerra*, 381 F. Supp. 3d at 1176-77; *N.C. Growers' Ass'n*, 702 F.3d at 770.

In any event, there are significant differences in the nature and scope of the rulemakings here that make it impossible to reliably attribute the difference in number of comments to the length of the comment periods. The 2020 Rules codified for the first time the Commission's authority to regulate proxy voting advice under the proxy rules and thus confirmed that Rule 14a-9's antifraud proscriptions apply. They also imposed a new industry-wide conflicts-disclosure standard. These additional provisions generated substantial commenter discussion in the prior rulemaking, *see* R. 35-2 (2020 Rules) at 298-300, 306-07, but were not revisited in this one. Many commenters in 2020 also focused on the proposed advance review process that was not adopted and thus not subject to reconsideration in 2022. *Id.* at 312-15.

48

Moreover, the record simply does not support plaintiffs' assertion (at 39) that "many" (let alone *hundreds*) of interested parties were prevented from commenting. As discussed, plaintiffs have not identified even *one*. And the notion that the Commission would have received an avalanche of additional comments if the comment period had been 30 days longer is belied by the trickle of only five late comments received by the Commission in the six months between the end of the comment period and adoption—which, consistent with its established practice, the Commission considered. R. 35-21 (2022 Amendments) at 731 n.71; *supra* 47.

Finally, contrary to plaintiffs' insinuation (at 18-19), there was nothing improper about the Chair and Commission staff meeting with investor groups after announcing reconsideration of the 2020 Rules. Such meetings are permitted under the APA and serve important policymaking functions. *See, e.g., Tex. Off. of Pub. Util. Counsel v. FCC*, 265 F.3d 313, 327 (5th Cir. 2001); *Sierra Club v. Costle*, 657 F.2d 298, 400-01 (D.C. Cir. 1981). Plaintiffs do not claim they were denied a similar opportunity. And, although agencies are not required to disclose pre-proposal meetings, *Home Box Off., Inc. v. FCC*, 567 F.2d 9, 57 (D.C. Cir. 1977), the Commission disclosed the meeting, its participants, and subject matter as soon as it issued a proposed rule. *See* R. 35-17 (2021 Proposed Amendments) at 696-97 n.24. In addition, the views of the meetings' participants are outlined in public comments some of them submitted. R. 35-21 (2022 Amendments) at 729-30.

49

**B.     Any deficiency in the comment period was plainly harmless.**

Even if the comment period had been insufficient, plaintiffs fail to show any prejudice.  *See* 5 U.S.C. 706.  An agency's mistake is harmless when it "clearly had no bearing on the procedure used or the substance of decision reached."  *United States v. Stevenson*, 676 F.3d 557, 565 (6th Cir. 2012) (quotation omitted); *see also United States v. Utesch*, 596 F.3d 302, 312 (6th Cir. 2010).  In the context of a notice-and-comment deficiency, that test hinges on "whether the affected parties had sufficient opportunity to weigh in on the proposed rule."  *Stevenson*, 676 F.3d at 565; *see also City of Arlington v. FCC*, 668 F.3d 229, 244 (5th Cir. 2012) (similar).

If this harmless error rule has any force, it must apply here.  Plaintiffs received notice of the proposed amendments 40 days before the comment period closed. R. 60-18 (U.S. Chamber Statement) at 1737.  They submitted extensive comments. *See, e.g.*, U.S. Chamber Comment (Dec. 23, 2021), https://www.sec.gov/comments/ s7-17-21/s71721-20110258-264516.pdf; R. 35-37 (Business Roundtable Comment) at 972-76.  And as in *Stevenson*, the Commission received and considered these and numerous other comments on the issues raised in this litigation.  676 F.3d at 565; *see also City of Arlington*, 668 F.3d at 243-45 (similar).

Plaintiffs' "fail[ure] to identify any substantive challenges [they] would have made had [they] been given additional time" confirms that any error was harmless. *Omnipoint*, 78 F.3d at 630; *see also U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 41 (D.C. Cir.

2005) (no prejudice where "every challenge to the [agency action] that [petitioners] have raised in their appellate briefs was also made during the comment period"); *Texas v. Lyng*, 868 F.3d 795, 799-800 (5th Cir. 1989) (similar). Vague speculation about 30 additional days potentially resulting in "better data" (Br. 41) is not enough. *Cf. Shinseki v. Sanders*, 556 U.S. 396, 413 (2009) (no prejudice where challenger "has not told . . . this Court what specific additional evidence proper notice would have led him to obtain or seek"); *Centro Legal*, 524 F. Supp. 3d at 956 (finding prejudice where plaintiffs submitted declarations identifying issues they were unable to address).

## III. Plaintiffs err in contending that vacatur is warranted if the Court finds an APA violation.

This Court should affirm the district court for all the reasons discussed above. But if the Court were to find that the Commission did not adequately explain the risks posed by the notice-and-awareness conditions or failed to provide sufficient notice and comment, the appropriate remedy would be to remand for the Commission to remedy the deficiency without vacating any of the 2022 Amendments.

1. The decision to vacate an agency action depends on "(1) the seriousness of the deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur." *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 674 (D.C. Cir. 2019) (quotation omitted). "There is no rule requiring either the proponent or opponent of vacatur to prevail on both factors," *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240,

270 (D.D.C. 2015), and a "strong showing of one factor may obviate the need to find

a similar showing of the other," *Am. Bankers Ass'n*, 934 F.3d at 674.  Thus, while

remand with vacatur is the "normal" remedy, *Allina Health Servs. v. Sebelius*, 746 F.3d

1102, 1110 (D.C. Cir. 2014), remand *without* vacatur "is generally appropriate when

there is at least a serious possibility that the agency will be able to substantiate its

decision given an opportunity to do so," *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety

Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021).

That principle would support remand without vacatur to remedy any error

here.  As discussed, the Commission could rationally conclude that the risks to

timeliness and independence were not sufficiently justified by the benefits of the

conditions, particularly in light of its view that the evidence does not establish

systematic inaccuracies in proxy advice.  The Commission reasonably identified its

timeliness and independence-related concerns, *see supra* 30-33, but even if the Court

were to disagree, there is at least "a serious possibility that the [Commission] will be

able to remedy [any] failure[]" by further explaining its policy choice.  *Tex. Ass'n of

Mfrs.*, 989 F.3d at 389; *see also Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1049

(D.C. Cir. 2002) (vacatur inappropriate where it is not "unlikely" the agency "will be

able to justify a future decision to retain the Rule").

The same remedy would be appropriate if the Court found the comment

period deficient.  The D.C. Circuit has vacated rules "when an agency entirely fail[s] to

provide notice and comment." *Daimler Trucks N. Am. LLC v. EPA*, 737 F.3d 95, 103 (D.C. Cir. 2013) (quotation omitted); *accord Allina Health*, 746 F.3d at 1110; *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009).  But courts frequently determine that vacatur is not appropriate when notice and comment is provided but falls short in some way.  *See Shands*, 139 F. Supp. 3d at 267 (citing cases); *see also, e.g.*, *Ctr. for Food Safety v. Regan*, 56 F.4th 648, 664 (9th Cir. 2022) (vacatur "not required" where "an agency is likely to be able to . . . adopt the same rule on remand"); *Cent. & S.W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2002) (similar).

2.  Any remedy should be limited to the notice-and-awareness conditions. Plaintiffs have abandoned their challenges below to the Commission's deletion of explanatory Note (e) to Rule 14a-9 and rescission of the 2020 Supplemental Guidance.  *See* R. 58 (SEC Mot. Summ. J.) at 1590-92.  But they ask the Court (at 62) to "set aside" the "2022 Rescission" without addressing whether that includes the note deletion and guidance rescission, and if so, whether they are severable.

An unlawful provision is severable where (1) there is no "substantial doubt that the agency would have adopted the same disposition regarding the unchallenged portion if the challenged portion were subtracted," and (2) "the remaining parts of the agency action can function sensibly without the stricken provision."  *Nasdaq*, 38 F.4th at 1144 (quotation omitted); *see also Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 351-52 (D.C. Cir. 2019).  Both conditions are met here.

53

The Commission's own words establish its intent with respect to the 2022 Amendments' three provisions. The Commission stated that if "any of the provisions of these amendments . . . is held to be invalid, such invalidity shall not affect other provisions . . . that can be given effect without the invalid provision or application." R. 35-21 (2022 Amendments) at 740-41. And the Commission specifically emphasized that the rescission of the notice-and-awareness conditions "operate[s] independently" of the deletion of Note (e). *Id.* at 741.

Moreover, plaintiffs do not—and cannot—dispute that the notice-and-awareness conditions could "function sensibly" without Note (e) and the 2020 Supplemental Guidance. *Carlson*, 938 F.3d at 352 (quotation omitted). Note (e) concerned the application of the proxy rules' antifraud provision, not the information and filing requirements and, in any event, "d[id] not change the scope or application of existing law." R. 35-2 (2020 Rules) at 330, 349. And in rescinding the 2020 Supplemental Guidance, the Commission reasonably concluded that its pre-existing guidance, in conjunction with investment advisers' fiduciary duty, was sufficient "to assist investment advisers in carrying out their obligations." R. 35-21 (2022 Amendments) at 736; *cf. Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1394 (D.C. Cir. 1990) ("[T]he presumption is always in favor of severability.").

The same analysis would apply to the procedural challenge. The explanatory note and guidance were not legislative rules requiring notice and comment, and thus

any failure to comply with those procedural requirements would not invalidate them. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015); *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251-52 (D.C. Cir. 2014).  And as discussed above, both are plainly severable from the conditions.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

/s/ Daniel E. Matro

| | |
|---|---|
| MEGAN BARBERO<br>General Counsel | TRACEY A. HARDIN<br>Assistant General Counsel |
| MICHAEL A. CONLEY<br>Solicitor | DANIEL E. MATRO<br>Senior Appellate Counsel |
| | Securities and Exchange Commission<br>100 F Street, N.E.<br>Washington, D.C. 20549 |
| August 2023 | (202) 551-8248 (Matro) |

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,989 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I also certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface—Garamond, 14 point—using Microsoft Word.

                                        /s/ *Daniel E. Matro*

August 4, 2023                          Daniel E. Matro

## CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2023, I electronically filed the foregoing Brief for Defendants-Appellees with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system, which will send notice to all the parties.

/s/ *Daniel E. Matro*
Daniel E. Matro

August 4, 2023

# DESIGNATION OF RELEVANT
# DISTRICT COURT DOCUMENTS

Pursuant to Sixth Circuit Rule 30(g)(1), appellees designate the following

district court documents as relevant:

| Record Entry | Description | Page ID # Range |
|---|---|---|
| R. 1 | Complaint | 1-59 |
| R. 26 | Certified List Describing the Record in Rulemaking Proceedings Before the Securities and Exchange Commission | 149-155 |
| R. 33 | Plaintiffs' Memorandum in Support of Their Motion for Summary Judgment | 179-216 |
| R. 35-1 | *Amendments to Exemptions From the Proxy Rules for Proxy Voting Advice*, 84 Fed. Reg. 66,518 (Dec. 4, 2019) | 247-289 |
| R. 35-2 | *Exemptions From the Proxy Rules for Proxy Voting Advice*, 85 Fed. Reg. 55,082 (Sept. 3, 2020) (2020 Rules) | 290-364 |
| R. 35-17 | *Proxy Voting Advice*, 86 Fed. Reg. 67,383 (Nov. 26, 2021) (2021 Proposed Amendments) | 693-713 |
| R. 35-21 | *Proxy Voting Advice*, 87 Fed. Reg. 43,168 (July 19, 2022) (2022 Amendments) | 726-755 |
| R. 35-37 | Comment Letter of Maria Ghazal, Senior Vice President & Counsel, Business Roundtable, File No. S7-17-21 (Dec. 23, 2021) | 972-976 |
| R. 35-50 | *Concept Release on the U.S. Proxy System*, 75 Fed. Reg. 42,982 (July 22, 2010) (Concept Release) | 1262-1292 |
| R. 58 | Combined Memorandum in Support of Defendants' Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment | 1563-1599 |
| R. 60-1 | Recommendation of the SEC Investor Advisory Committee (IAC) Relating to | 1627-1646 |

| Record Entry | Description | Page ID # Range |
|---|---|---|
| | SEC Guidance and Rule Proposals on Proxy Advisors and Shareholder Proposals (Jan. 24, 2020) (IAC Recommendation) | |
| R. 60-2 | Allison Herren Lee, Commissioner, U.S. Securities and Exchange Commission, *Paying More For Less: Higher Costs for Shareholders, Less Accountability for Management* (July 22, 2020) | 1648-1653 |
| R. 60-4 | Allison Herren Lee, Commissioner, U.S. Securities and Exchange Commission, *Protecting the Independence of the Proxy Voting Process:  Statement on Amendments Governing Proxy Voting Advice* (July 13, 2022) | 1658-1661 |
| R. 60-6 | Comment Letter of Jennifer Han, Executive Vice President, Chief Counsel & Head of Regulatory Affairs, Managed Funds Association, File No. S7-17-21 (Dec. 20, 2021) | 1669-1671 |
| R. 60-7 | Comment Letter of Gail C. Bernstein, General Counsel, Investment Adviser Association, File No. S7-17-21 (Dec. 27, 2021) | 1673-1679 |
| R. 60-8 | Comment Letter of Thomas P. DiNapoli, State Comptroller, State of New York Office of the State Comptroller, File No. S7-17-21 (Dec. 27, 2021) | 1681-1682 |
| R. 60-9 | Comment Letter of Melanie Senter Lubin, President, North American Securities Administrators Association, Inc. (NASAA), File No. S7-17-21 (Dec. 27, 2021) | 1684-1687 |
| R. 60-10 | Comment Letter of Kerrie Waring, Chief Executive Officer, International Corporate Governance Network | 1689-1692 |

| Record Entry | Description | Page ID # Range |
|---|---|---|
| | (ICGN), File No. S7-17-21 (Dec. 22, 2021) | |
| R. 60-11 | Comment Letter of Fran Seegull, President, U.S. Impact Investing Alliance, File No. S7-17-21 (Dec. 17, 2021) | 1694 |
| R. 60-12 | Comment Letter of Donna F. Anderson, Vice President, and Bob Grohowski, Managing Legal Counsel, T. Rowe Price, File No. S7-17-21 (Dec. 21, 2021) | 1696-1697 |
| R. 60-13 | Comment Letter of Theresa Whitmarsh, Chief Executive Officer, Washington State Investment Board, File No. S7-17-21 (Dec. 23, 2021) | 1699-1700 |
| R. 60-14 | Comment Letter of Patti Gazda, Corporate Governance Officer, Ohio Public Employees Retirement System (OPERS), File No. S7-17-21 (Dec. 23, 2021) | 1702-1706 |
| R. 60-15 | Comment Letter of Marcie Frost, Chief Executive Officer, California Public Employees' Retirement System (CalPERS), File No. S7-17-21 (Dec. 27, 2021) | 1708-1711 |
| R. 60-16 | Comment Letter of Stephen W. Hall, Legal Director and Securities Specialist, and Jason Grimes, Senior Counsel, Better Markets, File No. S7-17-21 (Dec. 27, 2021) | 1713-1722 |
| R. 60-17 | Comment Letter of Kenneth A. Bertsch, Executive Director, Council of Institutional Investors, File No. 4-725 (Oct. 24, 2019) | 1724-1735 |
| R. 60-18 | U.S. Chamber of Commerce, *U.S. Chamber Statement on SEC Proxy Advisory Firms Rule Rollback* (Nov. 17, 2021) | 1737 |

| Record Entry | Description | Page ID # Range |
|---|---|---|
| R. 64 | Plaintiffs' Combined Memorandum in Opposition to Defendants' Motion for Summary Judgment and Reply in Support of Plaintiffs' Motion for Summary Judgment | 1913-1935 |
| R. 74 | Memorandum Opinion Denying Plaintiffs' Motion for Summary Judgment and Granting Defendants' Cross-Motion for Summary Judgment | 2008-2046 |
| R. 75 | Order Denying Plaintiffs' Motion for Summary Judgment and Granting Defendants' Cross-Motion for Summary Judgment | 2047 |
| R. 76 | Entry of Judgment | 2048 |
| R. 77 | Notice of Appeal | 2049-2051 |